## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON

**JACKIE EDWARD SMITH,**

      **Plaintiff,**

**v.**                              **CASE NO. 2:11-cv-00600**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

### M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's application for Supplemental Security Income ("SSI"), under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.  Both parties have consented in writing to a decision by the United States Magistrate Judge.

Plaintiff, Jackie Edward Smith (hereinafter referred to as "Claimant"), filed an application for SSI on March 31, 2008, alleging disability as of June 1, 1993, due to mental illness, bipolar, manic depressive, low blood sugar, nerves, low back syndrome, enlarged heart, seizures, and high blood pressure.  (Tr. at 9, 143-46, 173-80, 217-23, 237-44.)  The claim was denied initially and upon reconsideration.  (Tr. at 9, 79-83, 88-90.)  On October 2, 2009, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 91-92.)  The video hearing was held on December 3, 2010 before the Honorable James P. Toschi.  (Tr. at 28-54, 55, 57, 105, 112.)  By decision dated December 23, 2010, the ALJ

determined that Claimant was not entitled to benefits.[1]  (Tr. at 9-22.)  The ALJ's decision became the final decision of the Commissioner on August 11, 2011, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-3.)  On September 6, 2011, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 1382c(a)(3)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 416.920 (2011).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. § 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the

---

[1]  Claimant filed a previous applications for Childhood Disability Benefits and SSI payments on April 14, 2004, alleging disability began on January 1, 1986.  Claimant failed to show for consultative physical and psychological evaluations.  The ALJ proceeded with the determination based upon the evidence in the file and the claims were denied. (Tr. at 65-70.)  Claimant previously filed an application for SSI on October 8, 1992.  A favorable decision was issued but benefits were ceased on January 1997 and terminated on April 1997.  (Tr. at 65.)  Claimant previously filed an application for SSI on January 18, 1996.  This claim was denied initially on May 29, 1997.  Id.  Claimant previously filed an application for SSI on January 10, 2001.  The claim was denied initially and on reconsideration, and dismissed on June 17, 2002 due to Claimant's failure to appear at the hearing.  (Tr. at 65-66.)

impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. § 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.   Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. § 416.920(f) (2011).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy.  McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date.  (Tr. at 11.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of major depressive disorder, generalized anxiety disorder and substance abuse. (Tr. at 11-12.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 12-13.)  The ALJ then found that Claimant has a residual functional capacity for a full range of work at all exertional levels, with these nonexertional limitations: "[due to] long history of substance abuse...could not sustain an eight hour workday or interact appropriately with co-workers, supervisors or the public."  (Tr. at 13.)  Claimant has no past relevant work.

3

(Tr. at 13, 21.)   Nevertheless, the ALJ concluded that "[i]f the claimant stopped the substance abuse", Claimant could perform jobs such as laundry worker, laundry worker/folder, and polisher, which exist in significant numbers in the national economy. (Tr. at 21.)  On this basis, benefits were denied.  (Tr. at 21-22.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  Hays v.Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 45 years old at the time of the administrative hearing.  (Tr. at 42.)  He has an eighth grade education.  (Tr. at 43.)  Although Claimant has no "past relevant work",

he has worked  in lawn care "for individuals", garbage collection "for two weeks" and as a masonry helper "for 3 or 4 months."  (Tr. at 19, 41, 49, 428, 498.)

<u>The Medical Record</u>

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize the mental health evidence below.

Records indicate Claimant was admitted to Beckley-Appalachian Regional Heathcare Hospital [B-ARHH] on July 24, 2005:  "Blood alcohol level at the time of admission was 199.1.  Urine drug screen was positive for THC...The patient...was started on routine detoxification."  (Tr. at 256.)  At Claimant's admission, Ahmed Faheem, M.D. stated:

> This 39-year-old male was admitted from the emergency room because of problems with alcohol, depression and suicidal ideation.  The patient has a well-established history of alcohol dependence.  He reportedly was drinking whatever he could lay his hands on...The patient indicated that he was having suicidal thoughts when he came to the hospital and was having thoughts of wanting to kill himself with an overdose...He reportedly has had seizures and DTs before.  The patient was worried about going through the same...
>
> The patient does not appear to be in any acute physical distress...
>
> Highest level of adaptive functioning currently appears to be 20 on the GAF [Global Assessment of Functioning] [2] scale.

(Tr. at 260-62.)

At Claimant's discharge on August 1, 2005, Dr. Faheem diagnosed Claimant with "1. Major affective illness.  2.  Depression.  3.  Alcohol dependence...Highest level of adaptive

---

[2] A GAF rating between 21 and 30 indicates "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. (Text Revision) 2000).

functioning currently appears to be 60 on the GAF[3] scale...The patient is to followup at FMRS in Fayetteville in a couple of weeks after discharge and also followup with Dr. Shams." (Tr. at 256-57.)

Records indicate Claimant was admitted to Beckley-Appalachian Regional Heathcare Hospital [B-ARHH] on August 23, 2005: "Blood alcohol level on admission was 295.8. Urine drug screening was positive for benzodiazepines and THC...The patient was started on routine detoxification." (Tr. at 276.) At Claimant's admission, Dr. Faheem stated:

> This 39-year-old male was recently discharged from here was re-admitted from the Emergency room because he indicated that he could not take his back pain any more...The patient indicated that it was his dad's birthday and it is the 2nd one since he had died and also his sister's birthday is tomorrow and she is also deceased and he has been thinking about killing himself to go and join with them...
>
> Major affective illness, bipolar depressed; Alcohol dependence...Highest level of adaptive functioning currently appears to be 20 on the GAF scale.

(Tr. at 278.)

On August 23, 2005, Sayed Shams, M.D., wrote in a consultative report:

> This is a 39-year-old male admitted to the psychiatric ward to the services of Dr. Faheem because of depression and suicidal ideation. The patient was recently discharged from this hospital about 3 weeks ago from the psychiatric unit after an admission for the same problems. He has multiple medical problems...He continues to drink heavily...
>
> The patient continues to smoke 1 pack of cigarettes daily. He has history of heavy alcohol use and says he drinks 4-5, 40-ounce bottles of beer daily. He admits to using marijuana, but no other drugs. He is single and has no partner at present. He does not work and is trying to file for disability.

(Tr. at 281-82.)

---

[3]  A GAF rating between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers). American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. (Text Revision) 2000).

At Claimant's discharge on August 31, 2005, Dr. Faheem diagnosed Claimant with "[m]ajor affective illness, bipolar, depressed; Alcohol dependence...Highest level of adaptive functioning currently appears to be 60 on the GAF scale...The patient is to followup in my office in about 2 weeks...He is also referred to the No Pain Clinic." (Tr. at 276-77.)

On July 12, 2008, Claimant was admitted to B-ARHH following a motor vehicle accident wherein he suffered a cerebral concussion. (Tr. at 392-425.) Claimant was intoxicated upon admission: "Alcohol level is noted to be 299." (Tr. at 393.) During his hospital stay, Claimant "went into alcohol withdrawal that was managed with sedation, IV fluids, and one-on-one monitoring." (Tr. at 395-96.)

On July 12, 2008, Barry K. Vaught, M.D. noted: "The patient has had a generalized convulsion in the setting of previous history of seizures and alcohol withdrawal. CT scan looked good. Chemistries are unremarkable. This is a combination of minor head injury with alcohol withdrawal plus baseline epilepsy." (Tr. at 398.)

On July 13, 2008, Tyshaun James-Hart, M.D. noted in a progress note: "Alcohol withdraw. He is currently being treated for delirium tremens [Dts]." (Tr. at 406.)

On July 14, 2008, Dr. Faheem examined Claimant at B-ARHH and noted:

The patient is a 42-year-old male who has a well-established history of alcohol dependence. The patient was reportedly in an automobile accident. He was brought over. The patient is very confused, disoriented, easily agitated. He has also been having some seizure-like activity. A neurology consultation has been written up. The patient has been very agitated, aggressive. He had to be restrained. The patient reportedly also has problems with being blind. He drinks beer daily. He has had symptoms of dependence including memory blackouts, seizures. The patient has a history of drinking for about 30 years. He reportedly has been very aggressive, requesting Budweiser, thinks he is at a store. He is talking to himself, responding to stimuli that are not there. The patient tries to grab when someone tries to get closer to him to examine or attend to him. He also has been spitting. He rambles, but he is very incoherent.

7

(Tr. at 402.)

Claimant was discharged on July 18, 2008 from B-ARHH when he was deemed "completely recovered" from the motor vehicle accident and alcohol withdrawal by Dr. James-Hart. (Tr. at 396.)

On July 24, 2008, Misti Jones-Wheeler, M.S. provided an "Adult Mental Profile" report to the West Virginia Disability Determination Service. (Tr. at 426-32.) Ms. Jones-Wheeler stated: "Though the claimant denied any use of alcohol for the past two years, he smelled significantly of alcohol, which was noted by the examiner, the psychometrician, and individuals in the waiting room." (Tr. at 428.) Regarding Claimant's legal history, she wrote:

> Mr. Smith reports that he has been incarcerated for "a good part of my life." He has been charged with things such as domestic battery and assault, destruction, and other things which he reports not being able to remember. His longest incarceration at one time was for six months. He states he has been incarcerated on and off since the age of 12.

(Tr. at 429.)

Ms. Jones-Wheeler concluded that the validity of the IQ testing she performed, showing Claimant's IQ to be a full scale IQ of 62 (verbal 66, performance 53) and grade equivalency to be between 4.1 and 6.9, was invalid:

> The claimant stated that he did not want to perform the testing, but did reportedly cooperate with all things asked of him. He exhibited great difficulty seeing and had to borrow the psychometrician's magnifying glass. He worked slowly and smelled of alcohol during the current exam. He also noted to the examiner prior to the testing that he knew if he did well on the testing that he would not receive his disability benefits. This testing is considered invalid due to these reasons. The scores are also not consistent with his academic history that he reported.

(Tr. at 429-30.)

8

Ms. Jones-Wheeler diagnosed Claimant with "[p]sychotic disorder, not otherwise specified" and "[a]lcohol abuse" and concluded that his prognosis is "[p]oor" and he "appears incapable of managing his finances."  (Tr. at 431.)

On February 8, 2009, Ms. Jones-Wheeler provided a "Neuropsychological Profile" of Claimant.  (Tr. at 438-44.)  She noted: "The claimant continued to smell of alcohol again during the current exam.  He stated, however, that he does not drink alcohol any longer."  (Tr. at 440.)  Regarding Claimant's intellectual testing showing a Full Scale IQ of 58, and Claimant's cognistat testing showing some severe deficits, she concluded:

> IQ VALIDITY:...He rubbed his eyes frequently and appeared tired, according to the psychometrician.  She, too, noted that he smelled of alcohol during the current exam.  These scores are not consistent with the reported educational history from this claimant.  Visual difficulties and possible alcohol use could be causing lower scores than he would otherwise produce...
>
> COGNISTAT VALIDITY: These scores show slightly mild deficits in the area of Repetition and Memory, mild deficits in the area of Calculation, moderately severe deficits in the area of Attention, and severe deficits in the areas of Construction and Similarities.  These scores are possibly invalid due to the same reasons noted under IQ Validity.

(Tr. at 440-41.)

Regarding Claimant's Mental Status Examination, Ms. Jones-Wheeler made these findings:

> Appearance: Blue eyes and gray hair.  He was casually dressed and somewhat unkempt.  Attitude/Behavior: Cooperative.  Speech: Clear, concise, and of normal tone.  Orientation: X4.  Mood: Euthymic.  Affect: Broad.  Thought Processes: Stream of thought was within normal limits.  Thought Content: No indication of delusional or obsessive-compulsive thinking.  Perceptual: No indication of hallucinations or illusions.  Insight: Within normal limits.  Psychomotor Behavior: Within normal limits, as evidenced by clinical observation.  Judgment: Severely deficient, based on his scaled score of 2 on the Comprehensive subtest of the WAIS-III.  Suicidal/Homicidal Ideation: Absent.  Immediate Memory: Moderately severe.  He immediately recalled two of four words.  Recent Memory: Moderately deficient, recalled two of the

9

four words after a 30-minute delay.  <u>Remote Memory</u>: Moderately deficient, based on inability to recall details of his personal history.  <u>Concentration</u>: Moderately deficient, based on his scaled score of 5 on the Digit Span subtest on the WAIS-III.  <u>Persistence</u>: Adequate, as noted by test-taking behavior. <u>Pace</u>: Within normal limits, as noted by test-taking behavior.

(Tr. at 441.)

Ms. Jones-Wheeler stated that during the evaluation she observed Claimant's social functioning to be "[w]ithin normal limits overall based on the claimant's interaction with others.  He was not distant.  He maintained frequent eye contact and he displayed some sense of humor." (Tr. at 441.)  Regarding Claimant's daily activities, she noted:

> The claimant reports rising at 5 a.m. and going to bed between 10 and 11 p.m. He stated that he helps his girlfriend take out the trash.  He vacuums and he reports doing okay with grooming.  He does not shop, as he get nervous. <u>Activities List</u>: The claimant stated that he sits and watches television and talks with his girlfriend.

(Tr. at 441-42.)

Ms. Jones-Wheeler again diagnosed Claimant with "[p]sychotic disorder, not otherwise specified" and "[a]lcohol abuse" and concluded that his prognosis is "[p]oor" and he "appears incapable of managing his finances."  (Tr. at 442-43.)

On February 19, 2009, a State agency medical source completed a Psychiatric Review Technique form.  (Tr. at 445-59.)  The evaluator, Timothy Saar, Ph.D., concluded that Claimant's impairment was "not severe" for his "psychotic disorder" and "alcohol abuse." (Tr. at 445, 447, 453.)  He concluded that Claimant had a "mild" degree of limitation in activities of daily living, maintaining social functioning, maintaining concentration, persistence or pace, and no episodes of decompensation.  (Tr. at 455.)  He marked that the evidence does not establish the presence of the "C" criteria.  (Tr. at 456.)  Dr. Saar concluded: "Clmt [claimant] appears credible as claims concur with MER [medical evidence

of record]. Invalid IQ and cognistat scores. All areas WNL [within normal limits] or mild as MER does not support severe limitations...Decision - impairment not severe." (Tr. at 457.)

On September 17, 2009, a State agency medical source completed a Psychiatric Review Technique form. (Tr. at 476-89.) The evaluator, John Todd, Ph.D., concluded: "A Psych CE was scheduled for this claimant and he did not attend; neither he nor his third-contact responded to Call-In Letters. FAILURE TO COOPERATE... ANALYSIS: Case cannot be adjudicated as clmt/3rd party failed to respond to CE, therefore, INSUFFICIENT EVIDENCE." (Tr. at 488.)

On February 1, 2010, Roger Mooney, M.A., Ed.D., licensed psychologist, and John P. Bowyer, M.A., supervised psychologist, concluded in a psychological evaluation:

> SUMMARY: Mr. Smith is a 44-year-old single, Caucasian male who was referred for psychological evaluation by the Fayette County Department of Health and Human Resources. Mr. Smith is applying for medical coverage benefits. On the WAIS-III, Mr. Smith obtained a Full Scale IQ score of 64. The difference between the Verbal IQ and Performance IQ was statistically insignificant. Mr. Smith is educationally and culturally disadvantaged. The educational and employment histories suggest that the IQ may underestimate the client's ability. The WAIS-III provides a valid measure of overall ability. The subtest scatter among the Verbal Scale was statistically significant.
>
> Mr. Smith reported feeling significantly depressed and anxious. He has felt depressed "my whole life." He relates the depression to the deaths of family members. The client's level of anxiety is exacerbated by "crowds." The client sees himself as a loner. There is a history of auditory and visual hallucinations. There is a history of "alcoholism." The abuse may reflect an attempt to control the psychopathology. The affective component combined with the history of auditory and visual hallucinations, the agitation, disruptions in concentration, sleep, and appetite disturbances and social isolation support the diagnosis of Schizoaffective Disorder.
>
> Mr. Smith would likely profit from involvement in any services available including those designed to assist the client in developing the skills needed to obtain employment. In particular, literacy training would benefit the

client. The client needs to be involved in treatment for both the physical and psychiatric problems.

(Tr. at 500-501.)

On February 10, 2010, M. Khalid Hasan, M.D., noted that Claimant was accompanied by a friend who stated that Claimant "has not drank since November of 2009." (Tr. at 495.) Dr. Hasan reported:

PAST PSYCHIATRIC HISTORY: He has been treated for depression and anxiety at B-ARHH and in Huntington. He attempted suicide by laceration in the past...

MENTAL STATUS: The patient was neat, tidy, and cooperative, talked clearly, audibly, and rationally. Speech was clear, lacked spontaneity. Affect was of some dysphoria. Oriented to time, place and person. Cognition was intact. No bizarre thought processes, tangential or circumstantial thinking was elicited. Abstract thinking was poor. The patient was able to spell the word WORLD forwards but not backwards. The patient appeared to be of limited intelligence due to social and cultural deprivation. No clinical evidence of organicity, psychosis or thought disorder were elicited. No auditory or visual hallucinations. No active homicidal or suicidal ideations or plans were entertained. Insight, judgment and problem solving was fair.

DAILY FUNCTIONING/PREMORBID PERSONALITY: The patient... has no particular hobbies and uses no drugs or alcohol. The patient does not belong to any clubs or organizations. The patient needs no help with care of personal chores and hygiene.

PSYCHIATRIC DIAGNOSES:
AXIS I:      Acute and Chronic Alcoholism.
             Alcohol Induced Mood Disorder.
AXIS II:     None.
AXIS III:    History of seizures, possible precipitated by alcohol...
AXIS IV:     Moderate
AXIS V:      GAF = 50[4]

TREATMENT PLAN/RECOMMENDATIONS: The patient definitely needs

---

[4] A GAF of 41-50 is defined as "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. (Text Revision) 1994).

outpatient psychiatric treatment.   Help with a Medicaid card is recommended.  Motivation to stop drinking is somewhat poor despite some legal problems.  He was strongly advised the importance of abstinence from alcohol.  NA/AA is recommended.  Church and exercise was recommended. Outpatient treatment is recommended.  Obtaining a GED is recommended. Motivation was rather poor.  Psychological testing is recommended to assess for any brain damage secondary to alcohol and seizures.  He is competent to handle his financial affairs but help in that context by a concerned family member as needed is recommended with his permission.   Prognosis is guarded.

(Tr. at 495-97.)

In a progress note dated September 8, 2010, Omar K. Hasan, M.D. stated:

The patient reports increased level of anxiety.  His sleep is variable.  The patient denies suicidality or homicidality.  No auditory, visual or tactile hallucinations.  No reported medication side effects.

DIAGNOSES:

AXIS I:        Major Depressive Disorder.
                Anxiety NOS.
                Alcohol Dependence.

PLAN:: The patient was not acutely suicidal, homicidal or psychotic, and does not warrant acute psychiatric admission.  I will increase Klonopin to 1 mg bid and increase Trazodone to 150 mg at bedtime.  He will continue with his other medications.  The patient will return to the clinic in one month to see Dr. K. Hasan.  The patient was counseled regarding rationale for therapy, possible medication side effects and voiced understanding.

(Tr. at 507.)

On September 17, 2010, Omar K. Hasan, M.D., stated in a report:

HISTORY OF PRESENT ILLNESS:  The patient reports a history of anxiety and depression. He has been following with Dr. K. Hasan for treatment for this disorder along with alcohol dependence. He reports that he does take his medications and they are helping him somewhat.  He reports a decreased amount of sleep.  His energy and concentration are okay.  He reports that his appetite is okay.  He has minimalized his alcohol and has not drank in the past week.  No paranoia, thought blocking, thought insertion, ideas of reference, magical thinking or manic symptoms.   The patient denies suicidality or homicidality.  No auditory, visual or tactile hallucinations.  No

13

medication side effects...

MENTAL STATUS: The patient appears appropriate for stated age, was casually dressed and grooming was good.  Pleasant and cooperative.  Alert and oriented X3.  Speech was normal rate, tone and volume.  Mood is not too good.  Affect is dysphoric.  Level of anxiety and psychomotor level of activity are slightly increased.  Thought is mostly linear and logical.  No formal thought disorder.  No suicidal or homicidal ideations, no auditory, visual or tactile hallucinations.  Judgment and insight are fair.  Estimated intelligence is average.

DIAGNOSES:
AXIS I:       Major Depressive Disorder, Recurrent, Moderate without Psychotic Features.
              Anxiety NOS.
              Alcohol Dependence, in Partial Remission.
AXIS II:      Deferred.
AXIS III:     Please refer to past medical history.
AXIS IV:      Stressors include AXIS I diagnoses.
AXIS V:       GAF = 45

PLAN: The patient was not acutely suicidal, homicidal or psychotic and does not warrant acute psychiatric admission.  He does have continued symptoms of anxiety and depression but they are somewhat improved with his current medications.  He has minimalized his alcohol and I feel that this contributed to his symptoms.  I would recommend that he continue to have access to medical care for treatment of his multiple psychiatric and medical problems in order to maintain his functional status for the foreseeable future.  The patient was counseled regarding rationale for therapy and voiced understanding.  He was advised to avoid all forms of drugs and alcohol, participate in social activities, and exercise on whatever basis he is able to.

(Tr. at 492-94.)

On October 14, 2010, Dr. Omar K. Hasan, M.D. completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) form.  (Tr. at 503-05.)  Dr. Hasan marked that Claimant had a "Fair" or "Poor" ability to make occupational, performance, and personal-social adjustments in all areas.  (Tr. at 503-04.)  He also marked "Yes" to the question "Can the individual manage benefits in his or her best interest?"  (Tr. at 505.)

On November 19, 2010, Claimant's representative provided copies of "Claimant's

14

Medications" and "Claimant's Recent Medical Treatment" forms showing that he was being treated by Omar Hasan, M.D. and Roger Mooney, M.A., at Raleigh Psychiatric Services and was being prescribed Zoloft 50 mg. (1 tablet daily), Trazodone 100 mg. (1 tablet at bedtime), and Clonazepam .1 mg. (1 tablet in the morning and 1 tablet at night). (Tr. at 253-55.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

       Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ did not give controlling weight to the opinion of Claimant's treating psychiatrist, Dr. Omar Hasan, regarding Claimant's Global Assessment of Functioning (GAF) Scale of 45.  (Pl.'s Br. at 9-12.) Specifically, Claimant argues:

> The ALJ erred when he failed to properly consider the effect of major affective disorder on the plaintiff's residual functional capacity [RFC] to perform a wide range of medium, light and sedentary work.
>
> In this case, the ALJ found that the plaintiff's substance abuse disorder was a contributing factor material to the determination of disability (20 C.F.R. §416.935) and if plaintiff stopped the substance abuse, the claimant would be able to perform unskilled, low stress with limited contact with co-workers, supervisors and the public.  The ALJ discounted the GAF score of 45 reported by Omar Hasan, M.D., by stating that the vocational expert [VE] had stated that GAF scores are subjective findings that have no vocational significance but never addressed the significance of GAF scores as having medical significance.
>
> The ALJ erred when he disregarded the significance of GAF scores because he then disregarded the opinion of the plaintiff's treating psychiatrist, Omar Hasan, M.D., physicians [sic] regarding the plaintiff's functional capacity.
>
> The Global Assessment of Functioning (GAF) Scale considers the psychological, social and occupational functioning continuum of mental health-illness.  The rating of overall psychological functioning on a scale of 0-100 is included in the DSM-III making it a medical finding and not a vocational finding.
>
> A score of 41-50 is an indicator of "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shop lifting) OR any serious impairment in social impairment in social, occupational or school functioning (e.g. no

friends, unable to keep a job).

A score of 45 given by Omar Hasan, M.D., the plaintiff's treating psychiatrist, is a medical opinion stating that the plaintiff is unable to work on a sustained basis.  It should have been analyzed as a medical opinion rather than dismissed by the vocational expert as having no significance.

There was no discussion as to whether the treating psychiatrist's opinion was supported by substantial evidence.  The ALJ merely deferred to the VE on a matter that is outside his area of expertise.

(Pl.'s Br. at 9-10.)

The ALJ's decision fails to give substantial weight to the opinion of Dr. Hasan whose opinion is supported by his opportunity to examine and treat the plaintiff on numerous occasions and by appropriate clinical findings without any explanation beyond a statement that "the VE indicated that the GAF are subjective findings that have no vocational significance" without citing any examples or authority which supports his conclusion. We are left to speculate as to his reason.

Due to failure of the ALJ to provide controlling weight to the opinion of the plaintiff's treating psychiatrist regarding plaintiff's functional capacity, without explanation, the ALJ's finding that the plaintiff can perform work at the medium, light and sedentary exertional level with the above-described limitations is erroneous.

(Pl.'s Br. at 12.)

The Commissioner's Response

The Commissioner responds that the ALJ properly considered the GAF ratings and substantial evidence supports the ALJ's finding that Claimant was not disabled.  (Def.'s Br. at 8.) Specifically, the Commissioner argues that Claimant's argument that the ALJ did not properly consider Dr. Omar Hasan's single GAF rating of 45 is without merit for several reasons:

First, a GAF rating represents an individual's presentation on a particular day.  See DSM-IV-TR at 32-33 (explaining that a GAF rating represents symptom severity or the level of functioning at the time of the evaluation).  As such, a GAF rating provides little more than a "snapshot" of a particular

day and is not conclusive evidence of a Plaintiff's functioning over time.

Second, GAF ratings have no direct legal or medical correlation to the Commissioner's finding of disability. The Commissioner has clarified that the GAF scale does not have a direct correlation to the severity requirements in the Commissioner's regulations. Therefore, a GAF rating is never dispositive on the issue of disability.  65 Fed. Reg. 50746-01m 50764-65 (2000).

Third, the ALJ's decision shows that he did consider the GAF rating of 45, when discussing Dr. Omar Hasan's treatment records (Tr. 19). The ALJ also considered the GAF rating of 50 by Dr. M. Khalid Hasan (Tr. 18).  Thus, the ALJ mentioned every GAF rating in the record.

Fourth, Dr. Carver's testimony supports the ALJ's finding of "not disabled" despite the GAF rating of 45.  Dr. Carver, who testified as a medical expert at the administrative hearing, specifically observed that Plaintiff's psychiatrist rated Plaintiff's GAF as 45 (Tr. 34).  Nevertheless, Dr. Carver testified that Plaintiff could perform simple low-stress work that involved only occasional contact with coworkers and supervisors, and no contact with the public (Tr. 35-36).  With those limitations, the vocational expert testified that such an individual could perform approximately 353,000 jobs in the national economy and 13,000 jobs in the regional economy (Tr. 50).

Fifth, Dr. Omar Hasan identified specific functional limitations that would not preclude Plaintiff from performing the jobs identified by the VE.  Dr. Omar Hasan opined that Plaintiff had a poor (defined as "seriously limited but not precluded") ability to relate to coworkers; interact with supervisors; maintain attention and concentration; understand, remember, and carry out detailed, but not complex job instructions; and behave in an emotionally stable manner (Tr. 503-04).  Plaintiff's counsel asked the VE whether the combined effect of these limitations would prevent Plaintiff from working on a sustained basis (Tr. 53).  In response, the vocational expert testified, "in my opinion the combined effect would not preclude employment.  They could work...specifically the jobs that I identified" (Tr. 53).  Thus, the functional limitations identified by Dr. Omar Hasan, the doctor who gave the GAF rating of 45, do not support Plaintiff's claim of disability.

Finally, the ALJ correctly noted the vocational expert's testimony that a GAF rating did not have vocational significance (Tr. 21, 51).  In response to Plaintiff's counsel, the VE explained that a GAF rating cannot be used for vocational purposes because the scale does not contain information specific enough to assist a vocational expert in understanding what the evaluator based a rating upon (Tr. 51).  Indeed, Plaintiff's counsel has not identified any specific limitations attributable to a single GAF rating of 45. Again, the actual functional assessments identified by Drs. Carver and Omar Hasan, both of

whom considered the GAF rating of 45, would not prevent Plaintiff from performing the jobs identified by the vocational expert.

(Def.'s Br. at 8-9.)

<u>Analysis</u>

Claimant argues that the ALJ erred in evaluating the September 13, 2010 opinion of Dr. Hasan, Claimant's treating physician, finding Claimant had a GAF of 45 following his consultative mental status examination.  (Pl.'s Br. at 9-12.)

The ALJ made these findings regarding Dr. Hasan's reports, including the September 13, 2010 report, as well as the psychiatric reports of Drs. Saar and Todd, and the testimony of Dr. Carver at the hearing:

A consultative examination from February 2010 showed the claimant presented to Dr. Omar Hasan's office accompanied by a friend.  The friend reported the claimant was unable to work due to a history of alcoholism, although he allegedly stopped drinking in November 2009.  The claimant denied current mental health treatment.  The claimant's mental status exam was normal, however, he was described as having limited intelligence due to social and cultural deprivation.  Insight, judgment and problem solving skills were noted to be normal.  Dr. Hasan diagnosed acute and chronic alcoholism and alcohol induced mood disorder with a global assessment of functioning of 50 (Exhibit C20F).  The record also contained an evaluation completed by John Boyer, MA or Roger Mooney Ed.D., however, the evaluation was not signed.  This evaluation showed the claimant's memory was intact, although some deficits were noted in working memory and concentration.  Attention was adequate and judgment and insight were limited.  The record showed a full scale IQ of 64, which placed the claimant in the mildly mentally retarded range.  His verbal IQ was 69 and performance IQ was 63.  Based on the claimant's education and vocational history the scores were found to be an underestimation of the claimant's overall ability (Exhibit C20F).

A progress note from Dr. Omar Hasan dated September 8, 2010 showed the claimant was not suicidal, homicidal or psychotic and did not require acute psychiatric admission.  Dr. Hasan adjusted the claimant's medication and diagnosed major depressive disorder, anxiety disorder NOS [not otherwise specified] and alcohol dependence (Exhibit C22F).  On September 13, 2010, the claimant returned to Dr. Hasan's office for a consultative examination.  Dr. Hasan noted the claimant reported smoking regularly but denied recent

alcohol use although he cited an extensive history of alcohol use.  The mental status examination was normal and the claimant's intelligence was estimated to be "average."  Dr. Hasan diagnosed major depressive disorder recurrent and moderate without psychotic features, anxiety disorder NOS, alcohol dependence in partial remission and a global assessment of functioning of 45 (Exhibit C20F).

Dr. Joseph Carver testified at the hearing.  He testified that the record showed some mental health problems, which appear to be alcohol related.  He referenced Exhibit 1F that showed the claimant was admitted to the hospital in 2005 for detox.  On admission, the claimant's drug screen was positive for benzodiazepines.  At the time, Zoloft was prescribed for the claimant.  He returned 21-days after discharge for substance abuse.  The drug screen was again positive for benzodiazepines.  In Exhibit 3F, Dr. Carver identified an emergency room visit for some sort of seizure and drug screen was positive.  Exhibit 9F revealed the claimant was involved in a motor vehicle accident.  The claimant was noted to be intoxicated at the time of the accident.  He reportedly told the emergency room staff to call the cops because he could not stay there.  The claimant was thought to have severe depression, alcohol intoxication and again went through detox.  In August 2008, Ms. Jones-Wheeler evaluated the claimant noting he smelled of alcohol, offered theatrical and dramatic auditory hallucinations and suggested he was diagnosed with paranoid schizophrenia.  Dr. Carver noted that although the claimant smelled of alcohol he denied use for three years.  The claimant reported a career in lawn care and garbage collection.  He noted the IQ scores achieved were found to be invalid due to poor effort.  Dr. Carver testified that despite all the "malingering" in the evaluation Ms. Wheeler diagnosed psychotic disorder NOS [not otherwise specified], which is "totally" inconsistent [with] the evaluation and based on the claimant's self report.  Dr. Carver noted Ms. Wheeler evaluated the claimant a second time.  During the subsequent evaluation, the claimant also minimized alcohol consumption although he smelled of alcohol and testing was found to be invalid.  Dr. Carver noted the claimant failed to attend a consultative examination in September 2009.  With regard to the invalid IQ scores, Dr. Carver explained the claimant had a ninth grade education in regular education classes.

Dr. Carver referenced Exhibit 20F, which showed the claimant sought mental health treatment at which time he applied for a medical card.  Psychometric testing showed a full scale IQ of 64.    The claimant was diagnosed with schizoaffective disorder based on his reports of hallucinations.  He noted Dr. Hasan diagnosed major depressive disorder and anxiety disorder NOS and thought the alcohol was in partial remission because the claimant minimized use.  He summarized that the record showed a history of alcohol abuse, but no evidence of mental retardation or psychosis.  In fact, he explained that Dr. Hasan noted the claimant was not psychotic but continued to diagnose major

depressive disorder, anxiety disorder NOS and alcohol dependence. Dr. Carver stated the major problem is the alcohol and drug dependence. He opined the claimant could work occasionally with coworkers and supervisors, but have no contact with the public. He indicated the claimant would be limited to simple tasks in a low stress environment. He indicated the claimant likely could not deal with work demands when intoxicated.

When questioned by the representative, Dr. Carver testified the psychological testing completed in February 2010 was consistent with behavior and not intellectual problems. He explained the claimant was in regular classes and consistently put forth poor effort. He noted that the conclusion paragraph showed inconsistent statements, such as the scores were thought to be an underestimation of his true ability but then noted the WAIS scores were considered a good estimate of his ability. He indicated the bottom line is the claimant may have low intellectual functioning but he is not mentally retarded. He explained that a person can put forth low effort and score in this range. Dr. Carver testified the record did not show the claimant was uncooperative, but offered minimal efforts. Dr. Carver concurred with the opinions that the IQ scores underestimated the claimant's ability. He noted the claimant reported completing the eighth grade, making all F's before being sent away to juvenile lock up. Dr. Carver explained the record contains no actual grades or standardized testing to help establish his level of functioning. He indicated all students are screened for special education. Since the claimant went through the eighth grade in regular classes, this suggests he passed all the testing and was not found to need special education. The undersigned gives great weight to Dr. Carver's opinion because it is consistent with the record as a whole.

As for the opinion evidence, Dr. Rabah Boukhemis reviewed the record and opined the record fails to document any severe physical impairment (Exhibit C8F). Subsequently, Dr. Boukhemis reviewed the record and affirmed the prior residual functional capacity, but noted the need to avoid heavy machinery and heights due to seizure precautions (Exhibit C13F). The undersigned gives great weight to Dr. Boukhemis' opinion because it is consistent with the objective evidence of record.

Dr. Rafael Gomez reviewed the record and completed a residual functional capacity form in which he opined the claimant has no severe physical impairments (Exhibit C18F). Great weight is given to Dr. Gomez's opinion because it is consistent with the record as a whole.

Concerning mental health opinions, Dr. Timothy Saar reviewed the record and evaluated the claimant under listing 12.04 and 12.09 but found no severe impairments. He opined the claimant was mildly limited in daily activities, social functioning, concentration, persistence and pace, with no episodes of

decompensation (Exhibit C15F).  Dr. John Todd completed a psychiatric review technique form in which he found insufficient evidence of severe mental impairment (Exhibit C19F).  In giving the claimant the benefit of doubt, the undersigned finds the claimant's depression and anxiety to be severe without alcohol.

Dr. Omar Hasan completed a mental residual functional capacity form.  He opined the claimant could understand, remember and carry out complex job instructions "fair" but would have difficulty with detailed work instructions.  He further rated the claimant as "poor" in the ability to relate to coworkers, interact with supervisors and maintain attention and concentration (Exhibit C21F).  The undersigned gives little weight to Dr. Hasan's opinion because it is internally inconsistent and inconsistent with the record as a whole.

(Tr. at 18-20.)

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.  See 20 C.F.R. § 416.927(d)(2) (2011).  Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence."  Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 416.927(d)(2) (2011).  The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. § 416.927(d)(2) (2011).  Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational.  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling

weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. § 416.927(d)(2).

The undersigned finds that the ALJ's decision reflects a careful consideration of Claimant's impairments, both alone and in combination in keeping with the applicable regulations. Contrary to Claimant's assertions, the ALJ did not disregard the opinion of Claimant's treating psychiatrist, Dr. Hasan, when considering Claimant's disability and functional capacity. More specifically, the undersigned concludes that the ALJ did not err in evaluating Dr. Hasan's September 13, 2010 GAF assessment of 45. The ALJ clearly considered all of Dr. Hasan's reports as well as his notation of the GAF:

> On September 13, 2010, the claimant returned to Dr. Hasan's office for a consultative examination...The mental status examination was normal and the claimant's intelligence was estimated to be "average." Dr. Hasan diagnosed major depressive disorder recurrent and moderate without psychotic features, anxiety disorder NOS, alcohol dependence in partial remission and a global assessment of functioning of 45 (Exhibit C20F).

(Tr. at 19.) The ALJ also considered the GAF rating of 50 by Dr. M. Khalid Hasan (Tr. 18).

As pointed out by the Commissioner, "GAF ratings have no direct legal or medical correlation to the Commissioner's finding of disability. The Commissioner has clarified that the GAF scale does not have a direct correlation to the severity requirements in the Commissioner's regulations. Therefore, a GAF rating is never dispositive on the issue of

22

disability.  65 Fed. Reg. 50746-01m 50764-65 (2000)."  (Def.'s Br. at 8.)

Also, Dr. Carver's testimony supports the ALJ's finding of "not disabled" despite the GAF rating of 45.  Dr. Carver, who testified as a medical expert at the December 3, 2010 administrative hearing, specifically observed that Claimant's psychiatrist rated Plaintiff's GAF as 45:

> He was offered a GAF of 45.  Centrally in this record, sir, we have a history of alcohol dependence and an attitude that has basically complicated all attempts to make an accurate diagnosis.  So, what, what we do see are things that are not there.  There isn't evidence of mental retardation.  There isn't any evidence of psychosis.  When he has psychotic symptoms those are actually related to alcohol withdrawal or pot, alcohol and drugs.  Dr. Pasant (Phonetic; sic, Hasan) in the most recent document, I believe, it's 22F, indicated that he's not psychotic, homicidal or suicidal.  Dr. Pasant continued to diagnose the major depressive disorder, anxiety disorder NOS and alcohol dependence.  The primary problem here is alcohol and drug dependence and I don't really have anything mental health wise that would meet or equal any of the mental health listings.

(Tr. at 34-35.)

Dr. Carver testified that Claimant could perform simple low-stress work that involved only occasional contact with coworkers and supervisors, and no contact with the public and identified jobs that such an individual could perform. (Tr. at 35-36, 50.)

The ALJ noted the VE's testimony that a GAF rating did not have vocational significance:

> If the claimant stopped the substance use, the claimant's ability to perform work at all exertional levels would be compromised by nonexertional limitations.  To determine the extent to which these limitations erode the occupational base of unskilled work at all exertional levels, the ALJ asked the VE whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and the residual functional capacity the claimant would have if he stopped the substance use.  The VE testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as laundry worker at the medium exertional level...laundry worker/folder at light exertion...and

23

polisher at sedentary...Upon further questioning by the representative, the VE testified that the jobs would continue to exist if the claimant had a valid IQ in the 60s. When asked if a GAF of 45 would preclude the jobs, the VE indicated the GAF are subjective findings that have no vocational significance. The VE further noted the jobs listed would not be precluded even if consideration was given to the combined effect of the "poor" ratings cited by Dr. Hasan. These ratings included a poor ability to relate to coworkers and supervisors, maintain attention and concentration and behave in a stable manner.

(Tr. 21.)

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this court.

The Clerk of this court is directed to transmit copies of this Order to all counsel of record.

ENTER: August 3, 2012

Mary E. Stanley
United States Magistrate Judge

24